## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

PATRICIA GANZZERMILLER, *et al.*       *

            *

         v.             *          Civil Action No. CCB-16-3696

            *

UNIVERSITY OF MARYLAND UPPER       *

CHESAPEAKE MEDICAL CENTER, *et al.* *

### MEMORANDUM

This case concerns the rights of a deaf companion's access to auxiliary aids when attending the medical appointments of a family member. The plaintiffs, Patricia Ganzzermiller and her son Andrew Ganzzermiller, generally allege that the defendants, the Upper Chesapeake Medical Center and Upper Chesapeake Health System (collectively, the "Medical Center") discriminated against them due to Mrs. Ganzzermiller's deafness. The Ganzzermillers have filed a motion for partial summary judgment (on liability) and the Medical Center has filed a motion for summary judgment. Both parties have filed motions to seal. For the forthcoming reasons, the court will deny the Ganzzermillers' motion for partial summary judgment, deny in part and grant in part the Medical Center's motion for summary judgment, and deny in part both motions to seal.

### FACTUAL AND PROCEDURAL HISTORY[1]

Mrs. Ganzzermiller is the widow of Lawrence Ganzzermiller and the mother of Andrew Ganzzermiller.[2] Mrs. Ganzzermiller is deaf, has very limited English reading and writing proficiencies, and can communicate effectively only by American Sign Language ("ASL"). For much of their lives together, Mr. Ganzzermiller served as Mrs. Ganzzermiller's primary ASL

---

[1] The parties have a lengthy history. Given the extensive record in this case, the court will recite only the necessary minimum facts here.

[2] To avoid confusion, all references to "Mr. Ganzzermiller" refer to Lawrence Ganzzermiller. The court will refer to Andrew Ganzzermiller by his first name.

interpreter. Andrew Ganzzermiller is the adult son of Mr. and Mrs. Ganzzermiller and has limited ASL signing abilities.

In January 2014, Mr. Ganzzermiller was diagnosed with stage four terminal lung cancer. His related treatment was largely palliative. Following his diagnosis, the Medical Center treated Mr. Ganzzermiller extensively for his cancer and related ailments. Mrs. Ganzzermiller routinely accompanied Mr. Ganzzermiller to his appointments. Mr. Ganzzermiller was hospitalized at Medical Center facilities on seven separate occasions: April 30–May 3, 2014; September 18, 2014; October 21–24, 2014; November 13–29, 2014; December 2–4, 2014; December 11–18, 2014; and February 16–18, 2015. During each of these hospitalizations, Mrs. Ganzzermiller visited Mr. Ganzzermiller daily. For the majority of the time he was hospitalized, Mr. Ganzzermiller was weak and fatigued. Mr. Ganzzermiller also attended numerous outpatient appointments at the Medical Center and underwent colon surgery on November 25, 2014.

Throughout the course of Mr. Ganzzermiller's treatment, the Medical Center usually did not provide Mrs. Ganzzermiller with an interpreter, leaving Mrs. Ganzzermiller confused and unable to communicate with hospital staff. Mrs. Ganzzermiller claims that she "continually asked for interpreting services" during her husband's hospitalizations and that Mr. Ganzzermiller "also made repeated requests" on her behalf. (Pls.' Mot. for Summary Judgment ("Pls.' Mot.") ¶ 42, ECF No. 65-1). The Medical Center, by contrast, asserts that "Mrs. Ganzzermiller never requested nor did she require an interpreter . . . because Mr. Ganzzermiller communicated the information he wanted her to know about his medical care and treatment[.]" (Defs.' Cross Mot. for Summary Judgment ("Defs.' Mot.") at 3–4, ECF No. 77-2).[3] On occasion, often when Mr.

---

[3] The parties state that there are no material facts in dispute, but the pleadings suggest that the parties *do* disagree about whether the Ganzzermillers requested interpretation services. The Medical Center claims that neither Mr. nor Mrs. Ganzzermiller ever requested an interpreter. Mrs. Ganzzermiller claims that on one occasion, she "requested interpreters from the nurses by pointing to a sign indicating that the hospital provided interpreters," and that "Mr.

Ganzzermiller was unable to interpret due to his condition, Andrew would interpret for his mother, requiring him to begin attending appointments that he otherwise would not have attended. Consequently, Andrew missed work, neglected family responsibilities with his wife and children, and was unable to drive his wife to the hospital when she was in labor. Andrew asserts that he asked for interpretation services for his mother multiple times but that he was denied. (Pls.' Mot. ¶¶ 54, 57, 78).

Mr. Ganzzermiller withheld information about his health from both Mrs. Ganzzermiller and Andrew. Mr. Ganzzermiller received his terminal prognosis from oncologist Venkata Parsa, M.D., at an appointment he attended alone. Mrs. Ganzzermiller attended subsequent appointments with Dr. Parsa but did not receive interpretation services. Although Mr. Ganzzermiller filled out a form indicating that Mrs. Ganzzermiller was permitted to access his protected health information, the form is revocable at any time; it was Dr. Parsa's practice to confirm whether health information may be shared during each visit. When Dr. Parsa asked Mr. Ganzzermiller if Mrs. Ganzzermiller needed an interpreter, Mr. Ganzzermiller told Dr. Parsa that he would interpret for his wife. (Parsa Deposition, Defs.' Mot. Ex. 7 at 71:6–13, ECF No. 77-10). According to Dr. Parsa, Mr. Ganzzermiller told him not to contact Mrs. Ganzzermiller or Andrew regarding his terminal diagnosis. (*Id.* at 148:8–18). It was also the understanding of other Medical Center staff that Mr. Ganzzermiller did not want his family to know the gravity of

---

Ganzzermiller also requested interpreters." (Pls.' Mot. ¶ 49). The Medical Center counters that nurse Daphne Lissauer remembers that episode differently. (Defs.' Mot. at 6–7). According to Lissauer, she asked Mr. Ganzzermiller if his wife needed an interpreter and he said no, that he would interpret for her. Lissauer further states that she believed, based on Mrs. Ganzzermiller's body language, that Mrs. Ganzzermiller agreed. (Lissauer Deposition, Defs.' Mot. Ex. 5 at 7:12–15, 12: 11–18, ECF No. 77-8).

During the time Mr. Ganzzermiller was receiving cancer treatments, Mrs. Ganzzermiller also received treatment relating to her own health from the Medical Center. Mrs. Ganzzermiller requested and received interpreter services during these visits. (Interpreter Records, Defs.' Mot. Ex. 7).

his prognosis.[5]

Mrs. Ganzzermiller and Andrew did not become aware of the terminal nature of Mr. Ganzzermiller's diagnosis until December 2014, when he permitted the Medical Center to disclose this information. Even after December 2014, during Mr. Ganzzermiller's last stay in the hospital in February 2015, no interpreter was provided for Mrs. Ganzzermiller. Mr. Ganzzermiller passed away at home on February 20, 2015.

On April 28, 2017, the Ganzzermillers filed their second amended complaint. Now pending is the motion for partial summary judgment, filed by Mrs. Ganzzermiller and Andrew, and the cross motion for summary judgment filed by the Medical Center.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247–48 (emphasis in original). The court must view the evidence in the light most

---

[5] Nurse Practitioner Allison McGonigal stated that Mr. Ganzzermiller was reluctant to discuss his health condition in front of his wife. (McGonigal Deposition, Defs.' Mot. Ex. 8 at 33:8–34:13, ECF No. 77-11). Palliative care physician Angela Poppe-Ries, M.D., stated that during one conversation, Mr. Ganzzermiller specifically told her not to call Mrs. Ganzzermiller. (Poppe-Ries Deposition, Defs.' Mot. Ex. 10 at 37:3–16, ECF No. 77-13). According to nurse practitioner Jennifer Goldsborough, Mr. Ganzzermiller "wanted to be the one to discuss anything [related to his health] with [Mrs. Ganzzermiller]." (Goldsborough Deposition, Defs.' Mot. Ex. 11 at 11:11–15, ECF No. 77-14).

4

favorable to the nonmoving party, *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (per curiam) (citation and quotation omitted), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568–69 (4th Cir. 2015). At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)). When parties have filed cross-motions for summary judgment, the court must consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 368 (D. Md. 2011) (quoting *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003)) (internal quotation marks omitted). "Both motions must be denied if the court finds that there is a genuine issue of material fact." *Id.*

## ANALYSIS

The Ganzzermillers allege that the Medical Center's failure to provide Mrs. Ganzzermiller with an ASL interpreter, either in person or via videoconference, constituted violations of federal statutes. Specifically, the Ganzzermillers contend that the Medical Center violated Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181 *et seq.*, the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*, and Section 1557 of the Patient Protection and Affordable Care Act ("ACA"), 42 U.S.C. § 18116 *et seq.*[7] The Ganzzermillers seek summary judgment on liability only, reserving the question of damages for trial, while the Medical Center

---

[7] Section 1557 of the ACA provides that "an individual shall not, on the ground prohibited under . . . section 794 of Title 29 [the Rehabilitation Act], be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance[.]" 42 U.S.C. § 18116(a). Given that the ACA explicitly incorporates the Rehabilitation Act's anti-discrimination provisions, the court will refer solely to the Rehabilitation Act for the purposes of this opinion.

argues that the court should grant summary judgment in its favor on all counts.

> Title III of the ADA mandates that
>
> [n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a). To that end, Title III directs that "[i]t shall be discriminatory to subject an individual or class of individuals on the basis of a disability . . . to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity." *Id.* at § 12182(b)(1)(A)(i). Hospitals are defined as "public accommodations." *Id.* at § 12181(7)(F). Title III further defines discrimination as the "failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services[.]" *Id.* at § 12182(b)(2)(A)(iii).

The purpose of the Rehabilitation Act is to ensure that no disabled person "shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). While the ADA and the Rehabilitation Act use different language, "[courts] construe the ADA and Rehabilitation Act to impose similar requirements," and each statute "require[s] a plaintiff to demonstrate the same elements to establish liability." *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 461 (4th Cir. 2012) (internal citations omitted). The two statutes differ only in establishing causation: The Rehabilitation Act requires that discrimination be the sole reason for the exclusion, while the ADA only requires that discrimination be a motivating cause of such exclusion. *Id.* at 461–62 (internal citation omitted). Further, while the Rehabilitation Act provides that injured parties may recover money damages,

Title III of the ADA permits parties to obtain only injunctive relief. *Proctor v. Prince George's Hosp. Ctr.*, 32 F. Supp. 2d 820, 824, 828-29 (D. Md. 1998); *see also Gillespie v. Dimensions Health Corp.*, 369 F. Supp. 2d 636, 640 (D. Md. 2005) ("Although Title III [of the ADA] does not allow a private party to seek damages, it does provide for injunctive relief" (internal citations omitted)).

Neither party disputes that Mrs. Ganzzermiller has a disability covered by the relevant statutes, nor do they dispute that the Medical Center is subject to those statutes. The only dispute is whether the Medical Center violated the ADA or the Rehabilitation Act by not providing interpretation services to Mrs. Ganzzermiller.

## A. Injunctive Relief under the ADA

As noted *supra*, Title III of the ADA permits only equitable relief. *Gillespie*, 369 F. Supp. 2d at 640. To establish standing to seek injunctive relief under Title III, the Ganzzermillers must show that

> (1) they suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) there [is] a casual [sic] connection between the injury and the conduct complained of; and (3) it [is] likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Feldman v. Pro Football, Inc.*, 579 F. Supp. 2d 697, 705 (D. Md. 2008) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)) (internal quotation marks omitted) (alterations in original). Moreover, to establish an "injury in fact," the Ganzzermillers must show a sufficient likelihood that they will suffer similar discrimination in the future should the complained-about conduct be permitted to continue. *Gillespie*, 369 F. Supp. 2d at 640–41 ("[T]he Supreme Court has explained that past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)) (internal

7

quotation marks omitted); *see also Proctor*, 32 F. Supp. 2d at 825.

Here, the Ganzzermillers have made no representations regarding the likelihood of repeated similar discrimination at the hands of the Medical Center and its staff. In fact, the Ganzzermillers fail to respond to the Medical Center's argument entirely. Over four and a half years have passed since Mr. Ganzzermiller's death, and there are no claims that Mrs. Ganzzermiller has returned to the Medical Center only to be denied appropriate auxiliary services owed to a companion. *Cf. Gillespie*, 369 F. Supp. 2d at 642 (holding that the plaintiffs' claim that they likely would continue to seek medical treatment from the defendant's facilities, in part due to the facilities' proximity to the plaintiffs' homes, sufficiently established standing to seek equitable relief).[9] Accordingly, the court will grant summary judgment in the Medical Center's favor on the Ganzzermillers' ADA claim.

## B. Rehabilitation Act and Intentional Discrimination

The court next considers whether the Medical Center violated the Rehabilitation Act by failing to provide Mrs. Ganzzermiller with an ASL interpreter. To prevail on a Rehabilitation Act claim, "a plaintiff must show that she was excluded from participation in, or denied the benefits of, a program or service offered by a public entity, or subjected to discrimination by that entity." *Paulone*, 787 F. Supp. 2d at 371 (quoting *Constantine v. Rectors and Visitors of George Mason University*, 411 F.3d 474, 499 (4th Cir. 2005)). Pursuant to the Rehabilitation Act, entities of public accommodation must "make reasonable accommodations for persons with disabilities[.]" *Paulone*, 787 F. Supp. 2d at 371; *see also Innes v. Bd. of Regents of Univ. Sys. of*

---

[9] A speculative argument could be made that Mrs. Ganzzermiller, by the nature of her disability, may face similar discrimination in seeking her own medical care at the Medical Center's facilities. Earlier in these proceedings, Mrs. Ganzzermiller had claimed just that, but she dropped this claim once it became apparent that the Medical Center adequately accommodated her disability during her own appointments. Accordingly, there is no reason to believe that the Ganzzermillers are at any risk of similar discriminatory treatment in the future.

*Md.*, 29 F. Supp. 3d 566, 577–78 (D. Md 2014) (internal citations omitted). For violations of the Rehabilitation Act, the Fourth Circuit has held that "a full panoply of legal remedies are available." *Pandazides v. Va. Bd. of Educ.*, 13 F.3d 823, 830 (4th Cir. 1993); *accord Paulone*, 787 F. Supp. 2d at 373.

The Rehabilitation Act's regulations provide that a qualifying recipient of federal funds may not "[d]eny a qualified handicapped person the opportunity accorded others to participate in the program or activity receiving Federal financial assistance[.]" 28 C.F.R. § 42.503(b)(1)(i). Additionally, the regulations instruct that federal funding recipients "shall insure that communications with their applicants, employees and beneficiaries are effectively conveyed to those having impaired vision and hearing[,] *id.* at § 42.503(e), and that they "shall provide appropriate auxiliary aids to qualified handicapped persons with impaired sensory, manual, or speaking skills where a refusal to make such provision would discriminatorily impair or exclude the participation of such persons in a program or activity receiving Federal financial assistance." *Id.* at § 42.503(f); *see also Paulone*, 787 F. Supp. 2d at 372.

The regulations governing the implementation of the ADA are also instructive in interpreting the Rehabilitation Act. *See Paulone*, 787 F. Supp. 2d at 372 (using the Justice Department's regulations to "further elucidate the requirement of reasonable accommodations" for both ADA and Rehabilitation Act claims); *Proctor*, 32 F. Supp. 2d at 826 (noting that "[r]egulations promulgated under the [Rehabilitation] Act govern the interaction between a hospital and hearing impaired patients and, though not binding on courts, are instructive" and "[r]egulations under the ADA also are instructive due to the similarity between" the ADA and the Rehabilitation Act). The ADA implementation regulations provide that "[a] public accommodation shall take those steps that may be necessary to ensure that no individual with a

disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services[.]" 28 C.F.R. § 36.303(a); *see also Feldman*, 579 F. Supp. 2d at 708–09. Such auxiliary aids and services include, *inter alia*, qualified, on-site interpreters, interpreters available through video remote interpreting, transcription services, written materials, and the exchange of written notes. *Id.* at § 36.303(b)(1).

Importantly, the ADA's regulations explicitly provide that "a public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities. *This includes an obligation to provide effective communication to companions who are individuals with disabilities.*" *Id.* at § 36.303(c)(1) (emphasis added). Under the regulations, a companion is any

> family member, friend or associate of an individual seeking access to, or participating in, the goods, services, facilities, privileges, advantages, or accommodations of a public accommodation, who, along with such an individual, is an appropriate person with whom the public accommodation should communicate.

*Id.* at § 36.303(c)(1)(i). Further, the regulations mandate both that "[a] public accommodation shall not require an individual with a disability to bring another individual to interpret for him or her[,]" *id.* at § 36.303(c)(2), and that "[a] public accommodation shall not rely on an adult accompanying an individual with a disability to interpret or facilitate communication[,]" *id.* at § 36.303(c)(3), except in the case of an emergency involving an imminent threat to either the individual's or the public's safety, *id.* at § 36.303(c)(3)(i), or when "the individual with a disability specifically requests that the accompanying adult interpret or facilitate communication, the accompanying adult agrees to provide such assistance, and reliance on that adult for such assistance is appropriate under the circumstances[,]" *id.* at § 36.303(c)(3)(ii).

### 1. Scope of Rehabilitation Act Liability

While a "successful plaintiff in a suit under . . . the Rehabilitation Act is generally

entitled to a full panoply of legal and equitable remedies[,] [t]here are some limits to the availability of relief[.]" *Paulone*, 787 F. Supp. 2d at 373 (citing *Pandazides*, 13 F.3d at 829–32) (internal quotation marks omitted). Specifically, "compensatory damages are available only upon proof of intentional discrimination or disparate treatment, rather than mere disparate impact." *Id.* (citing *Pandazides*, 13 F.3d at 829–30, n.9); *accord Innes*, 29 F. Supp. 3d at 582. In this context, "intentional discrimination and disparate treatment . . . are synonymous, [and] a plaintiff need not show discriminatory animus to prevail on a claim for damages" under the Rehabilitation Act. *Paulone*, 787 F. Supp. 2d at 373 (citing *Pandazides*, 13 F.3d at 830 n.9) (internal quotation marks omitted); *accord Innes*, 29 F. Supp. 3d at 583.

Instead, to establish intentional discrimination, plaintiffs must prove that defendant entities acted intentionally or with deliberate indifference. *Paulone*, 787 F. Supp. 2d at 373–74 (citing *Proctor*, 32 F. Supp. 2d at 828). Even if violations of the Rehabilitation Act "resulted from mere thoughtlessness and indifference rather than because of any intent to deny Plaintiff's rights," a plaintiff is "entitled to damages if hospital staff acted knowingly, voluntarily, and deliberately." *Id.* (citing *Proctor*, 32 F. Supp. 2d at 828). "[T]he level of proof necessary for finding intentional discrimination under the Rehabilitation Act means a deliberate indifference to a strong likelihood that a violation of federal rights would result." *Innes*, 29 F. Supp. 3d at 582 (citing *Proctor*, 32 F. Supp. 2d at 829 n.6) (internal quotation marks omitted). Defendant entities "intentionally violate . . . the Rehabilitation Act by demonstrating deliberate indifference when they have notice of the potential risk of their decision, and clearly refuse the accommodation accordingly." *Id.* (citing *Proctor*, 32 F. Supp. 2d at 829) (internal quotation marks omitted).

A plaintiff may bring a Rehabilitation Act claim by alleging a violation by its agent, *see Paulone*, 787 F. Supp. 2d at 372, but to show deliberate indifference, the plaintiff must show

action or inaction by someone in a position of some authority to address the alleged discrimination, *cf. Gebser v. Lago Vista Ind. Sch. Dist.*, 524 U.S. 274, 276 (1989) (holding that intentional discrimination in the Title IX context requires action or inaction by "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures"). While the Fourth Circuit has not yet defined "deliberate indifference" in the context of an alleged Rehabilitation Act violation, the court is persuaded by the Eleventh and Second Circuits' articulation of the so-called "official requirement." The Eleventh Circuit has held that "an entity is only liable for the deliberate indifference of someone whose actions can fairly be said to represent the actions of the organization." *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 350 (11th Cir. 2012) (citing *Gebser*, 524 U.S. at 290). And, in a case involving a hospital's alleged failure to provide a deaf patient with an ASL interpreter, the Second Circuit recently held that compensatory damages under the Rehabilitation Act are only available if "someone at the hospital had actual knowledge of discrimination against the [plaintiff], had authority to correct the discrimination, and failed to respond adequately." *Biondo v. Kaledia Health*, 935 F.3d 68, 74 (2d Cir. 2019) (internal quotation and citation omitted). Whether someone is an "official" within the meaning of the deliberate indifference standard is necessarily a fact-specific inquiry. *Liese*, 701 F.3d at 350; *Biondo* 935 F.3d at 76. [10, 11]

---

[10] The Second Circuit in *Biondo* expressly declined to adopt the Eleventh Circuit's additional requirement that a "policymaker" or "official" be someone who has "substantial supervisory authority" within an organization. *Biondo*, 935 F.3d at 75–76 (quoting *Liese*, 701 F.3d at 350). To the extent that the Second and Eleventh Circuit differ on the definition of "official" or "policymaker," the court adopts the *Biondo* court's formulation. *See id.* ("The [substantial supervisory authority] requirement is unspecific, and unhelpful in the setting of a large, ramified institution where many patients and visitors do not interact with a supervisor, or know how to identify one, much less how to find one.").

[11] The Medical Center relies on *Loeffler v. Staten Island University Hospital*, 582 F.3d 268, 275 (2d Cir. 2009), for the proposition that because the deliberate indifference standard requires action or inaction by a "policymaker," the Medical Center cannot be held liable for actions by doctors and nurses. This reliance is misplaced. In fact, the *Loeffler* court noted that the doctor employed by the defendant hospital was "arguably a policymaker." *Id.* at 276. In any event, any ambiguity in the *Loeffler* court's definition of "policymaker" was clarified by *Biondo*. 935 F.3d at 77 ("[A]n "official" or "policymaker" must be someone who has some discretion at a 'key decision point' in the administrative process . . . Given the hierarchy of a hospital, the key decision point will vary with the decision to be

12

The Medical Center asserts that the Ganzzermillers cannot establish a violation of the Rehabilitation Act because the doctors and nurses, who were allegedly deliberately indifferent to Mrs. Ganzzermiller's rights, were not policymakers. (Defs.' Mot. at 45, ECF No. 77-2). The Ganzzermillers counter that even under a "policymaker" standard, the actions of doctors and nurses can support a finding of deliberate indifference. (Pls.' Resp. to Defs.' Mot. ("Pls.' Resp.") at 49, ECF No. 84). The court agrees with the Second and Eleventh Circuits that deliberate indifference requires action or inaction by "someone who has some discretion at a key decision point in the administrative process." *Biondo*, 935 F.3d at 76 (quoting *Liese*, 701 F.3d at 350)) (internal quotation marks omitted). The court also agrees that "[g]iven the hierarchy of a hospital . . . the official or policymaker with discretion to make the decision will vary[.]" *Id.* Consequently, the viability of the Ganzzermillers' Rehabilitation Act claim against the Medical Center turns on whether the doctors and nurses had discretion to make the "key decision" to provide or deny auxiliary aid. The parties dispute whether the nurses and nurses had this type of discretion within the Medical Center hierarchy. Despite the parties' assertions to the contrary, the court finds this dispute of fact to be both genuine and material. *See Biondo*, 935 F.3d at 76 (finding a genuine dispute of material fact as to whether hospital staff had the authority to call an ASL interpreter but deliberately failed to do so); *Sunderland v. Bethesda Hosp. Inc.*, 686 F. App'x 807, 816 (11th Cir. 2017) (finding a genuine dispute of material fact as to whether hospital nurses had the discretion to determine whether auxiliary aids were appropriate); *Loeffler*, 582 F.3d at 276–77 (finding a genuine dispute of material fact as to whether hospital staff, including doctors, had the authority to provide an interpreter but acted with deliberate indifference in failing to provide one). The resolution of this dispute of material fact is not

---

made, and the official or policymaker with discretion to make the decision will vary accordingly.") (internal citations and quotation marks omitted).

appropriate on summary judgment.

## 2. Companion Rights under the Rehabilitation Act

The Fourth Circuit has not addressed whether a deaf companion to a patient at a medical facility has the same or similar entitlement to an ASL interpreter as a deaf patient would in the same circumstances. The Eleventh Circuit, however, held in *Durand v. Fairview Health Servs.* that "family visitors and similarly situated stakeholders are entitled to . . . participation in certain conversations, access to certain information, and, ultimately, effective communication of that information." 902 F.3d 836, 843 (11th Cir. 2018) (citing 28 C.F.R. § 36.303(c)). In *Durand*, the deaf parents of a terminally-ill adult son claimed that they "were not able to fully comprehend the severity of [their son]'s condition" due to the limited amount of interpretation services provided to them. *Id.* at 843. But the *Durand* court noted that because the son had "specifically elected not to include [his parents] as parties authorized to receive his medical information," the obligation to provide effective communication did not require the hospital to facilitate the parents' access to *all* their son's medical information. *Id.* at 842–43. The court found it sufficient that the hospital provided the parents "with access to information, through interpreters, before and during [the son]'s final hospitalization and provided ample opportunities for [the parents] to ask questions that may have clarified their understanding" of their son's condition. *Id.* at 842–43. Accordingly, the Eleventh Circuit concluded that the defendant medical facility had not "failed to discharge its duty to provide effective communication." *Id.* at 843.

It is undisputed that Mr. Ganzzermiller elected to withhold certain medical information from Mrs. Ganzzermiller. Pursuant to the Health Insurance and Portability Accountability Act ("HIPAA"), the Medical Center had an obligation to protect Mr. Ganzzermiller's privacy. *See* 42 U.S.C. 1320d *et seq.*; 45 C.F.R. § 164.510(b). HIPAA prohibits health care providers,

including hospitals, from disclosing a patient's protected health information to others without the patient's authorization. 45 C.F.R. § 164.502(a). If a patient expresses an objection to the disclosure of protected health information, a health care provider cannot disclose the information. 45 C.F.R. § 164.510(b)(2)(i).

The Medical Center clearly faced two competing obligations: its duty to protect Mr. Ganzzermiller's privacy and its duty to accommodate Mrs. Ganzzermiller's disability. While *Durand* does not directly address the intersection of HIPAA and the Rehabilitation Act, the Eleventh Circuit found that the son's decision to exclude his parents from access to certain medical information was relevant to its holding. 902 F.3d at 842–43. Specifically, even though the hospital had a duty under the Rehabilitation Act to facilitate "effective communication" with the parents, the *extent* of the required assistance was tempered by the parents' "limited authority to receive certain medical information." *Id.* The court is persuaded by the *Durand* court's reasoning. The Medical Center cannot be liable for its failure to provide Mrs. Ganzzermiller with auxiliary aids if access to such aids would have violated Mr. Ganzzermiller's right to privacy under HIPAA.

Again, the court disagrees with the parties' contention that there are no genuine disputes of material fact. According to Mrs. Ganzzermiller, Mr. Ganzzermiller "repeatedly gave consent for Defendants to discuss his protected healthcare information with his wife." (Pls.' Resp. at 18, ECF No. 84).[12] But the Medical Center maintains that "Mr. Ganzzermiller repeatedly indicated

---

[12] In support of this assertion, Mrs. Ganzzermiller cites the depositions of several hospital staff members. Nurse McGonigal stated that "[Mr. Ganzzermiller] didn't specifically ask me not to share information with [Mrs. Ganzzermiller]." (McGonigal Deposition, Pls.' Mot. Ex. 21 at 35:15 – 20, ECF No. 67-11). Dr. Elie Fraiji recalled meeting with Mr. Ganzzermiller while Mrs. Ganzzermiller and Andrew were in the room and stated that "[w]ho is in his room [during discussions about protected health information] is [Mr. Ganzzermiller's] decision. If he didn't want me to answer questions in front of his son, he would have made arrangements one way or another to make that clear." (Fraiji Deposition, Pls.' Mot. Ex. 10 at 40:6–17, ECF No. 66-9). Dr. Parsa stated that "we ask [patients] if they want [family members] to be in the room, and the other thing is do you want us to talk about everything, or leave things out. So if they say we want you to talk about everything, then . . . the companion is going to be in the

that he did not want his health care team to communicate with his family about his medical condition or treatment," (Defs.' Mot. at 35, ECF No. 77-2), and suggests that by serving as his wife's ASL translator, Mr. Ganzzermiller was deliberately controlling her access to his medical information (*id.* at 33). Mrs. Ganzzermiller's Rehabilitation Act turns on whether the Medical Center's failure to provide auxiliary aids prevented her from accessing information she was actually entitled to receive.[13] Accordingly, the court cannot resolve this factual dispute on summary judgment.[14]

## C. Associational Discrimination

Finally, Andrew Ganzzermiller seeks summary judgment in his favor based on his associational discrimination claim. For the following reasons, the court will deny his motion and grant the Medical Center's cross motion on this claim.

The Rehabilitation Act provides that "any person aggrieved by any act or failure to act by [a qualifying recipient of funds]" may seek the "remedies, procedures, and rights set forth in

---

room for the entire visit . . . I would have asked [Mr. Ganzzermiller] do you want to talk about everything, and he would have said yes." (Parsa Deposition, Pls.' Mot. Ex. 7 at 78:14–79:3, ECF No. 66-6). Dr. Parsa also did not "recall anything specific" about whether Mr. Ganzzermiller asked to restrict the amount of information shared in front of anyone else. (*Id.* at 147:7–20). None of this deposition testimony, however, directly rebuts the Medical Center's claim that Mr. Ganzzermiller was controlling the flow of information to Mrs. Ganzzermiller by serving as her ASL translator.

[13] Additionally, if Medical Center staff reasonably believed that Mr. Ganzzermiller desired to keep certain medical information private, Mrs. Ganzzermiller likely cannot show that the doctors and nurses acted with deliberate indifference to her Rehabilitation Act rights.

[14] Mrs. Ganzzermiller's claim appears to be strongest as to hospital interactions *after* she became aware of the terminal nature of Mr. Ganzzermiller's cancer, including during his final hospitalization and discharge. Dr. Parsa recalled meeting with Mr. Ganzzermiller, Mrs. Ganzzermiller, and Andrew in December 2014, by which time Mr. Ganzzermiller had disclosed his prognosis to his wife and son. Dr. Parsa called for an interpreter for this meeting because "[t]his was the first time I was communicating with the wife along with [Mr. Ganzzermiller], and I wanted to . . . meet with him and his wife." (Parsa Deposition at 104:6–10). The use of an interpreter on that occasion suggests that Dr. Parsa no longer believed Mr. Ganzzermiller was attempting to keep medical information private from his wife. Thus, the fact that Mrs. Ganzzermiller was not provided with an interpreter on February 18, 2015— the date of Mr. Ganzzermiller's final hospital discharge and when Mrs. Ganzzermiller would have been the intended recipient of discharge instructions—appears to constitute the clearest potential Rehabilitation Act violation. (Pls.' Mot. Ex. 31 at 119; Ex. 2 ¶ 15). The factual dispute about whether the doctors and/or nurses who participated in this final discharge were "officials" within the meaning of the Rehabilitation Act, however, prevents the court from deciding the claim on summary judgment.

Title VI of the Civil Rights Act of 1964[.]" 29 U.S.C. § 794a(a)(1)–(2). The Fourth Circuit has not specifically addressed whether non-disabled individuals have standing to bring Rehabilitation Act claims for injuries sustained through association with a disabled individual. The Fourth Circuit has, however, held that Title II of the ADA permits associational discrimination claims. *A Helping Hand*, 515 F.3d 356, 362–65 (4th Cir. 2008). In *A Helping Hand*, the court found that "Title II's enforcement provision does *not* limit its remedies to individuals with disabilities . . . Title II expressly provides a remedy to *any* person alleging discrimination on the basis of disability[.]" *Id.* at 364 (internal citation and quotation marks omitted) (emphases in original). The Fourth Circuit noted that "Congress has directed courts to construe the ADA to grant at least as much protection as the Rehabilitation Act and its implementing regulations," that "Titles I and III [of the ADA] provide a cause of action for associational discrimination[,]" and that Title II's language explicitly incorporates section 794a of the Rehabilitation Act. *Id.* at 362–64 (internal citations omitted). Accordingly, the *Helping Hand* court found that Title II permitted claimants to pursue associational discrimination claims, even in the absence of an express associational discrimination provision. *Id.* Moreover, the First, Second, Third, Sixth, and Eleventh Circuits have accepted associational discrimination claims pursuant to the Rehabilitation Act. *See McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1142 (11th Cir. 2014) (citing *Addiction Specialists, Inc. v. Twp. of Hampton*, 411 F.3d 399, 405–09 (3d Cir. 2005); *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 333–35 (6th Cir. 2002); *Weber v. Cranston Sch. Comm.*, 212 F.3d 41, 47–49 (1st Cir. 2000)); *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 46–48 (2d Cir. 1997) .

While the Fourth Circuit has held that associational discrimination claims are permitted under Title II of the ADA and suggested that such claims are also permitted under the

Rehabilitation Act, it has not addressed what standard courts should employ in evaluating whether an individual has standing to pursue such claims. The Second and Eleventh Circuits, however, have both addressed this question. Both circuits have found that a non-disabled individual may seek relief under the Rehabilitation Act for injuries sustained due to their association with a disabled individual, *McCullum,* 768 F.3d at 1143; *Loeffler,* 582 F.3d at 280, but the Circuits used different standards to evaluate these types of injuries.[18] In *Loeffler,* the Second Circuit held that claims of associational discrimination "need only establish that [the complainant] suffered an injury independent from [the disabled individual] that was causally related to the [public accommodation]'s failure to provide services[.]" *Loeffler,* 582 F.3d at 280. In *McCullum,* the Eleventh Circuit adopted a more stringent reading of 29 U.S.C. § 794a(a)(2)— expressly rejecting the *Loeffler* court's interpretation—and held that threshold standing requires non-disabled individuals claiming associational discrimination to establish the same level of discrimination as the disabled individual. Specifically, a claimant must show "that they were personally excluded, personally denied benefits, or personally discriminated against because of their association with a disabled person." *McCullum,* 768 F.3d at 1143; *accord M.R. by & through N.R. v. Tajdar,* No. TDC-17-3836, 2018 WL 6050888, at *3 (D. Md. Nov. 19, 2018).[19] In declining to follow *Loeffler,* the *McCullum* court noted that permitting non-disabled individuals to "seek relief under the [Rehabilitation Act] and ADA for injuries other than exclusion, denial of benefits, or discrimination that they themselves suffer . . . would mean that Congress granted non-disabled persons more rights under the ADA and [the Rehabilitation Act] than it granted to disabled persons[.]" *McCullum,* 768 F.3d at 1143–44 (internal citations

---

[18] In *Durand,* when faced with an associational discrimination claim, the Eighth Circuit explicitly declined to adopt either the *Loeffler* or the *McCullum* standard, finding that the claimant did not satisfy either standard and reserving the question of which standard to adopt for another day. 902 F.3d at 844.

[19] Unreported cases are cited not for their precedential value, but for the soundness of their reasoning.

omitted). This, according to the Eleventh Circuit, exceeded the Rehabilitation Act's stated purpose to "promote the rights of the disabled." *Id.* at 1144.

Assuming that the Rehabilitation Act permits associational discrimination claims, the court nevertheless finds that Andrew lacks standing in this case. As between the Eleventh and Second Circuits' approaches to the standing question, the court finds that the Eleventh Circuit standard is more aligned with the text and purpose of the Rehabilitation Act. The court is persuaded by the *McCullum* court's reasoning that the *Loeffler* approach, if adopted, could afford greater protections to the associates of individuals with disabilities than the disabled individuals themselves. Such a reading of the Rehabilitation Act is untenable. Moreover, the court emphasizes that adoption of the *Loeffler* standard would require courts to fashion their *own* standards for minimum threshold injuries sufficient to allege associational discrimination, without an obvious limiting principle. As the dissent in *Loeffler* noted, Congress, in its enactment and related discussion regarding remedies for associational discrimination, provided the courts with no indication that it intended to implement such sweeping protections for non-disabled persons. *Loeffler*, 582 F.3d at 285–86 (Jacobs, J., dissenting).

Under the *McCullum* standard, Andrew's injuries do not rise to the level of a violation of the Rehabilitation Act. He was not excluded from the Medical Center's services, denied the benefits of the Medical Center's services, or otherwise discriminated against by the Medical Center. While the court does not doubt that the Medical Center's treatment of Mrs. Ganzzermiller negatively affected Andrew's personal and professional life, this impact does not constitute the kind of discrimination for which this court may award relief.

**D. Motions to Seal**

The Ganzzermillers and the Medical Center have filed motions to seal their motions for

summary judgment and the accompanying memoranda and exhibits. (ECF Nos. 64, 78). "The common law presumes a right to inspect and copy judicial records and documents." *Stone v. Univ. of Maryland Med. Sys. Corp.*, 855 F.2d 178, 180 (4th Cir. 1988) (citing *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978). Additionally, the First Amendment guarantees access to documents filed in connection with a summary judgment motion in a civil case. *Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 253 (4th Cir. 1988). The First Amendment right of access can only be abridged upon a showing that "the denial serves an important governmental interest and that there is no less restrictive way to serve that governmental interest." *Id.* In determining whether to grant a motion to seal, a district court must "give the public notice of a request to seal and a reasonable opportunity to challenge it." *Stone*, 855 F.2d at 181 (citing *In re Knight Publ'g Co.*, 743 F.2d 231, 235 (4th Cir. 1984)). The public notice requirement is satisfied by docketing a motion to seal "reasonably in advance of deciding the issue." *Id.* A district court "must consider less drastic alternatives to sealing," and if it decides to seal, must state the reasons for its decision. *Id.*

Here, the public notice requirement is satisfied due to the length of pendency of both motions to seal.[20] While the court recognizes that the motions for summary judgment, and their accompanying memoranda and exhibits, contain private and personal information, a less drastic alternative to complete sealing is available here. Accordingly, to afford appropriate consideration to the First Amendment right of access to documents filed in connection with a summary judgment motion, the court will order the parties to file redacted versions of their motions, memoranda, and exhibits, maintaining under seal only demonstrably confidential personal medical information entitled to protection.

---

[20] The Ganzzermillers' motion to seal was docketed on November 15, 2018, (ECF No. 64), and the Medical Center's motion to seal was docketed on December 17, 2018 (ECF No. 78).

## CONCLUSION

For the foregoing reasons, the court will deny the Ganzzermillers' motion for partial summary judgment. The court will grant in part and deny in part the Medical Center's cross-motion for summary judgment. Specifically, the court will grant summary judgment in the Medical Center's favor on Andrew Ganzzermiller's associational discrimination claim, and on Mrs. Ganzzermiller's Title III ADA claim, but will deny the motion for summary judgment on Mrs. Ganzzermiller's Rehabilitation Act claim. The court will deny both motions to seal but grant the parties 28 days to file redacted versions of their motions, memoranda, and exhibits. A separate order follows.

9/30/19
Date

_CCB_

Catherine C. Blake
United States District Judge